UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANDRO CASTRO,<br>    Petitioner | )<br>)<br>) |
| v. | ) Cr. No. 11-10170-MLW<br>) |
| UNITED STATES OF AMERICA,<br>    Respondent | )<br>)<br>) |

MEMORANDUM AND ORDER

WOLF, D.J.                                                              August 9, 2017

I.    INTRODUCTION

On February 14, 2012, petitioner Sandro Castro pled guilty to distributing at least five grams of cocaine within 1,000 feet of a school, in violation of 21 U.S.C. §§841(a)(1) and 860. He was subsequently sentenced to 46 months in custody and eight years of Supervised Release. The evidence against Castro included two drug certifications by chemist Annie Dookhan stating that substances purchased from Castro by a cooperating witness tested positive for cocaine base. After his sentencing, it was discovered that Dookhan had routinely falsified positive test results. As a result, Castro has moved to vacate his conviction and withdraw his plea.

The court is denying the motion. Even without Dookhan's drug certifications, the other evidence that the substance seized from Castro was cocaine is sufficient to give the court confidence that Castro, who does not claim to be actually innocent, would have

pled guilty even if the government had disclosed Dookhan's misconduct.

II. FACTUAL AND PROCEDURAL BACKGROUND

Castro was charged with the instant offense after an investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (the "ATF") into a suspected drug and gun trafficking operation in Brockton, Massachusetts. See Presentence Report ("PSR") at ¶9.[1] During the investigation, a cooperating witness made two controlled purchases of a substance suspected to be crack cocaine from Castro. See id. Before both purchases, the cooperating witness ordered two "eight balls" of crack cocaine from Castro on the telephone. Id. at ¶11. He was then recorded asking Castro to "make those two for me" and that he was "on [his] way to grab those two thingys." Id. at ¶¶11, 13. He told Castro that he was making the purchase for someone else, and asked, "should I tell him it's gonna be like this for good, the same prices, or if he keeps

---

[1] Courts regularly consider facts to which the petitioner agreed at sentencing, including uncontested allegations in the presentence report, to determine whether there is a "reasonable probability" that he would have insisted on a trial absent the government's misconduct or ineffective assistance of counsel. See, e.g., United States v. Jaramillo, 124 Fed. Appx. 628, 629 (10th Cir. 2005); United States v. Fortes, 2016 WL 8692835 at *4 (D. Mass. Sept. 30, 2016)(O'Toole, D.J.); United States v. Catalano, 2016 WL 4007550, at *2 (D. Mass. June 26, 2016)(O'Toole, D.J.); United States v. Tooley, 2015 WL 566953, at *6 (D. Mass. Feb. 11, 2015)(Casper, D.J.).

2

coming, it'll get lower?" PSR at ¶13. The cooperating witness then drove to Castro's apartment at 263 Green Street in Brockton, where Castro retrieved 5-7 grams of the substance from a bureau and exchanged it with the witness for $350. See id. at ¶15. The interaction was recorded on video and audio equipment. See id. at ¶¶10, 14. Castro was subsequently arrested. See PSR at ¶2.

The substance was tested by chemist Annie Dookhan at the Massachusetts Department of Health Hinton State Laboratory in Jamaica Plain. See Gov. Opp. Ex. 2. Dookhan signed certificates of drug analysis stating that the substances obtained in both purchases tested positive as cocaine base. See id.

It was later discovered that Dookhan was, at the time, engaging in repeated misconduct in connection with drug samples she tested. As recently summarized by Judge George O'Toole,

> Dookhan's offenses are now well-known. She worked as chemist at the Hinton Lab from 2003 through 2012. In 2011, Dookhan was cited for a breach of laboratory protocol. The [Department of Health] launched an investigation which exposed an alarming pattern of lapses and irregularities at the Hinton Lab. Dookhan was ultimately indicted and pled guilty to twenty-seven criminal charges, including perjury and evidence tampering, admitting among other things that she rigged test results by contaminating negative samples with known drugs from completed tests and dry-labbing (i.e., falsely certifying she had tested drug samples when she had only given them a visual examination).

United States v. Fortes, 2016 WL 8692835, at *2 (D. Mass. Sept. 30, 2016). The Massachusetts Supreme Judicial Court also found that Dookhan falsified the substance of reports intended to verify,

3

before each test, the proper functioning of a sophisticated machine used to confirm the analyses of other chemists. See Commonwealth v. Scott, 467 Mass. 336, 340-41 (2014).

Castro moved for appointment of counsel to challenge his conviction based on the government's failure to disclose Dookhan's misconduct before he entered his plea. The court subsequently appointed James J. Cipoletta, Esq., who represented Castro in the underlying case, as counsel for Castro in this §2255 proceeding. Castro moved to vacate his conviction and withdraw his guilty plea. The government has opposed the motion.

III. LEGAL STANDARDS

    A. Review under §2255

A prisoner in federal custody may collaterally attack his conviction under 28 U.S.C. §2255. As the First Circuit has explained:

> Section 2255 contemplates four potential bases on which a federal prisoner may obtain relief: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction to impose such sentence"; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

Damon v. United States, 732 F.3d 1, 3 (1st Cir. 2013) (quoting 28 U.S.C. §2255(a)). In an action under §2255, "[t]he burden of proof is on the petitioner." Wilder v. United States, 806 F.3d 653, 658 (1st Cir. 2015), cert. denied, 136 S. Ct. 2031 (2016).

4

When a prisoner files a §2255 petition, 28 U.S.C. § 2255(b) requires that:

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.

28 U.S.C. §2255(b). As the First Circuit wrote in United States v. McGill, 11 F.3d 223 (1st Cir. 1993):

> We have distilled these principles into a rule that holds a hearing to be unnecessary "when a § 2255 motion (1) is inadequate on its face, or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and records of the case." Moran v. Hogan, 494 F.2d 1220, 1222 (1st Cir. 1974). In other words, a "§2255 motion may be denied without a hearing as to those allegations which, if accepted as true, entitle the movant to no relief, or which need not be accepted as true because they state conclusions instead of facts, contradict the record, or are 'inherently incredible.'" Shraiar v. United States, 736 F.2d 817, 818 (1st Cir. 1984) (citations omitted).

Id. at 225-26 (some citations omitted); see also United States v. Panitz, 907 F.2d 1267 (1st Cir. 1990); David v. United States, 134 F.3d 470, 478 (1st Cir. 1998) ("To progress to an evidentiary hearing, a habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings."). "Moreover, when . . . a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings

5

based thereon without convening an additional hearing." McGill, 11 F.3d at 225.

B. Withdrawal of a Plea based on Government Misconduct

"As a general matter, a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." Wilkins v. United States, 754 F.3d 24, 28 (1st Cir. 2014). However, there are exceptions. Among other things, "a prisoner can collaterally attack his sentence on the ground that his guilty plea was not knowing or voluntary if his claim is based on evidence not available to him at the time of the plea." Id. (quoting Ferrara v. United States, 456 F. 3d 278, 289 (1st Cir. 2006)).

> To prevail on this kind of claim, a convicted defendant who asserts a right to rescind his guilty plea because of newly discovered government misconduct must make two showings. First, he must show that some egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) antedated the entry of his plea. Second, he must show that the misconduct influenced his decision to plead guilty or, put another way, that it was material to that choice.

Id. (citations omitted).

"The prosecution's failure to disclose evidence may be sufficiently outrageous to constitute the sort of impermissible conduct that is needed to ground a challenge to the validity of a guilty plea." Ferrara, 456 F.3d at 291. The First Circuit has not decided whether the failure of prosecutors to notify a defendant

6

of Dookhan's misconduct constitutes such "egregiously impermissible conduct." See Wilkins, 754 F.3d at 28. The Massachusetts Supreme Judicial Court, however, has "established a special evidentiary rule whereby a defendant seeking to vacate a guilty plea under rule 30(b) [of the Massachusetts Rules of Criminal Procedure] as a result of the revelation of Dookhan's misconduct, and proffering a certificate of drug analysis (drug certificate) from the defendant's case signed by Dookhan on the line labeled 'Assistant Analyst,' [is] entitled to 'a conclusive presumption that egregious government misconduct occurred in the defendant's case.'" Commonwealth v. Resende, 475 Mass. 1, 3 (2016)(quoting Scott, 467 Mass. at 357).

In this case, Dookhan signed the certificate of drug analysis as the primary chemist. See Docket No. 46-2. The government does not argue that Castro fails to meet the first prong of the Ferrara test. This argument is, therefore, waived. See United States v. Zannino, 895 F. 2d 1, 17 (1st Cir. 1990). However, because Castro has not satisfied the second prong, it is unnecessary to decide whether the federal government's failure to discover and disclose Dookhan's misconduct was "egregiously impermissible conduct" under Ferrara. Wilkins, 754 F.3d at 28.

To satisfy the second prong, the "materiality," or "prejudice," requirement:

> the petitioner must show a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial. For this purpose, a reasonable probability means a probability sufficient to undermine confidence in a belief that the petitioner would have entered a plea.

Wilkins, 754 F.3d at 28 (citing Hill v. Lockart, 474 U.S. 52, 59 (1985)).

When the misconduct involves newly discovered evidence not previously disclosed, the court must consider whether the undisclosed evidence likely would have changed the defendant's prediction regarding the outcome of a trial. See Hill, 474 U.S. at 60. However, the petitioner is not required to show that he would have been acquitted if he had gone to trial. See Smith v. Cain, 565 U.S. 73, 75 (2012). "The elementary question is whether a reasonable defendant standing in the petitioner's shoes would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession." Ferrara, 456 F.3d at 294. The First Circuit has outlined a non-exclusive list of factors relevant to this determination:

> (i) [W]hether the sequestered evidence would have detracted from the factual basis used to support the plea; (ii) whether the sequestered evidence could have been used to impeach a witness whose credibility may have been outcome-determinative; (iii) whether the sequestered evidence was cumulative of other evidence already in the defendant's possession; (iv) whether the sequestered evidence would have influenced counsel's recommendation as to the desirability of accepting a particular plea bargain; and (v) whether the value of the sequestered evidence was outweighed by the benefits of entering into the plea agreement.

8

Id. at 294 (citations omitted).

The "nondisclosure of powerful impeachment evidence" is "apt to skew the decision making of a defendant who is pondering whether to accept a plea agreement." Ferrara, 456 F.3d at 296. If the government had discovered and disclosed the evidence of Dookhan's routine fraudulent conduct before Castro pled guilty, Castro could have used the evidence to impeach Dookhan's testimony at trial. However, the failure to disclose evidence of Dookhan's misconduct does not prejudice a defendant when the other evidence persuades the court that there is not a reasonable probability that the defendant would have insisted on a trial in the absence of Dookhan's drug certifications. See Wilkins, 754 F.3d at 29.

In Wilkins, the First Circuit found that the petitioner failed to show a reasonable probability that he would have insisted on a trial if he had known of Dookhan's misconduct. See id. The "circumstances of the [alleged drug] sale," which "followed the pattern of a prototypical street corner buy," a field test indicating that the substance the petitioner sold was crack cocaine, and the fact that the defendant was arrested with a stockpile of similar bags was sufficient circumstantial evidence to preclude a finding that the suspect laboratory tests were "material" to his decision to plead guilty. Id. In addition, a new laboratory test performed by a different chemist demonstrated that

9

uncontaminated samples of the seized drugs tested positive for cocaine. See Wilkins, 754 F.3d at 29. Finally, the fact that the petitioner, "unlike the petitioner in Ferrara, admitted his factual guilt (including the nature of the contraband sold) in open court at the time that he changed his plea" was entitled to "significant...weight," especially where he did not, in his §2255 motion, retract that admission or claim to be factually innocent. Id.

IV. ANALYSIS

Castro has not established that there is a "reasonable probability" that he would have insisted on a trial if he had known about Dookhan's misconduct. Wilkins, 754 F.3d at 28.

"Of the federal courts to have addressed post-conviction petitions under Brady and Ferrara in the wake of the Dookhan scandal, not one has vacated a guilty plea." United States v. Hampton, 109 F. Supp. 3d 431, 436 (D. Mass. 2015), appeal dismissed (Jan. 20, 2016)(citing cases). These courts have all denied such petitions because circumstantial evidence of the identity of substances seized from defendants and tested by Dookhan was sufficient to sustain convictions despite the government's failure to disclose her misconduct. However, in most of those cases, either Dookhan was not the primary chemist who tested the substance, but rather was the "secondary" chemist who confirmed another chemist's work, or another test was performed on the substance to verify its

identity. See, e.g., United States v. Catalano, 2016 WL 4007550, at *3 (D. Mass. June 26, 2016)(finding that "Dookhan's secondary role in testing Catalano's sample suggests that the impeachment value of Dookhan's misconduct would be minimal here" because the Massachusetts Office of the Inspector General had found "no evidence that Dookhan tampered with any drug samples assigned to another chemist even when she played a role in confirming another chemist's test results.");[2] United States v. Tooley, 2015 WL 566953, at *4 (D. Mass. 2015)(Casper, D.J.)(Feb. 11, 2015)("The government explains that the bags have been retested and confirmed for cocaine," and the defendant possessed other substances at the time of his arrest that "field tested positive as crack cocaine"). In this case, in contrast, there is no evidence that any expert testing other than Dookhan's identified the drugs as cocaine, and Dookhan was the primary chemist who tested the samples at the Hinton laboratory. See Docket No. 46-2.

The government argues that the substance was "field tested" by the DEA agents who seized it. Gov's Opp. at 19. It relies on a December 10, 2009 ATF investigation report states that "Detective Costello advised [Special Agent] White the suspected crack cocaine

---

[2] The Supreme Judicial Court in Scott made the apparently contrary finding that Dookhan had engaged in misconduct in cases where she was secondary, or "confirmatory," chemist as well as cases in which she was the "primary" chemist. Scott, 467 Mass. at 341.

11

tested positive for cocaine and weighed 7.7 [gross grams]." Gov.'s Ex. 1 (Docket No. 48-1) at 6, ¶11. However, that statement is hearsay, and does not specify what kind of test was performed or whether Detective Costello was qualified to perform it. See F.R.E. 801. The rules of evidence apply to proceedings under §2255. See Advisory Committee Note to F.R.E. 1101(d)(3); Ferrara, 384 F. Supp. 2d at 426. Therefore, there is no admissible evidence that a test was performed by a qualified witness other than Dookhan, in contrast to Wilkins, 754 F.3d at 29, United States v. Uricoechea-Casallas, 946 F. 2d 162, 166 (1st Cir. 1991), Resende, 475 Mass. at 18-19, United States v. Paiva, 892 F. 2d 148, 892 F. 2d 148, 160 (1st Cir. 1989), United States v. Booker, 576 F. 3d 506, 521 (8th Cir. 2009), and United States v. Coleman, 179 1056, 1060 (7th Cir. 1999). However, the ATF report, which would have been produced to Castro before any trial, would have put Castro and his counsel on notice that the government had a law enforcement officer who would testify at trial that the substance Castro sold field-tested positive for cocaine unless Castro could successfully challenge the officer's qualifications to provide an opinion under F. R. E. 702.

In any event, "identification of a controlled substance does not require direct evidence if available circumstantial evidence establishes its identity beyond a reasonable doubt." United States v. Walters, 904 F. 2d 765, 770 (1st Cir. 1990). "Proof based on

12

scientific analysis or expert testimony is not required to prove the illicit nature of a substance, and identification of a substance as a drug may be based on the opinion of a knowledgeable lay person." Id. Here, the nature of the transaction, the testimony of lay witnesses, and Castro's own admissions provide sufficient circumstantial evidence that the substance seized from Castro was cocaine to sustain his conviction.

"Circumstantial evidence establishing identification may include a sales price consistent with that of cocaine; the covert nature of the sale; on-the-scene remarks by a conspirator identifying the substance as a drug; lay experience based on familiarity through prior use, trading, or law enforcement; and behavior characteristic of drug sales." United States v. Dominguez, 992 F. 2d 678, 681 (7th Cir. 1993). In Walters, two cocaine users identified the substance the defendant was selling as cocaine. 904 F. 2d at 770. Testimony regarding their "experience with cocaine and...the cocaine distribution process," including observing approximately fifty cocaine sales conducted by the defendant, "establish[ed] [their] competence" to identify the drugs. Id. The jury, therefore, could reasonably rely on their lay opinions, which were based on the price of the substance, the packaging, and the routine used during the sales, to conclude the substance was cocaine. See id. at 771.

Similarly, in United States v. Fanfan, the First Circuit found the lay opinions of two law enforcement agents to be sufficient to warrant the district judge's finding, by a preponderance of the evidence, that the substance sold by the defendant was crack cocaine, for the purposes of an enhancement under the sentencing guidelines. 468 F.3d 7, 14 (1st Cir. 2006). In addition, in United States v. Stewart, the Third Circuit found the evidence sufficient to uphold a finding of guilt where a cocaine user and distributor familiar with the appearance and "going rate" of cocaine in the locale testified, based on the covert manner of the transaction and the appearance and price of the substance, that it was cocaine. See 179 Fed. Appx. 814, 181-19 (3d Cir. 2006).

In the instant case, the uncontested facts in the presentence report indicate that trained DEA agents identified the substance as cocaine based on its "color, odor, and texture." PSR at ¶16. Moreover, the cooperating witness stated that he asked Castro for two "eight balls" of crack cocaine on two occasions. PSR at ¶11. Each time, Castro subsequently exchanged two bags of a substance weighing 5-7 grams for payment of $350 in his apartment. See PSR at ¶¶13-16, 18. Castro has not suggested that the substance was counterfeit, and there is no evidence to support such a claim. In any event, it is "highly unlikely that [Castro] would have engaged in multiple drug deals selling faux crack cocaine," as the district court found in United States v. Smith, 2013 WL 6798931, at *3 (D.

14

Mass. 2013)(Stearns, D.J.). Therefore, the circumstances of the sales are consistent with narcotics transactions, as they were in Wilkins, 754 F. 3d at 29.

In addition, Castro also admitted to the statement in the PSR that the substance he sold was crack cocaine. See PSR at ¶18. In this §2255 proceeding, Castro does not claim he was actually innocent. Moreover, Castro's trial counsel does not assert that he would have advised Castro to proceed to trial if he had known that the accuracy of Dookhan's drug certifications was suspect.

The ample untainted evidence of Castro's guilt, and Castro's failure to retract his admissions of guilt and assert his innocence, distinguish this case from Ferrara, a case decided by this court. Ferrara pled guilty to directing his co-defendant, Pasquale Barone, to murder Vincent Limoli as part of Ferrara's alleged racketeering activity on behalf of the Patriarca Family of La Cosa Nostra. See Ferrara, 384 F. Supp. 2d 384, 387-88, 393 (D. Mass. 2005)(Wolf, D.J.). The only direct evidence against Ferrara was the testimony of Walter Jordan, an associate of the Patriarca Family who testified to the grand jury that Ferrara had "ordered, or told [Barone] that he had to clip [Limoli]." Id. at 393. This court found that "the government's case concerning the Limoli murder depended heavily, if not exclusively, on Jordan's testimony." Id. at 398. In fact, at Barone's trial, that testimony

was the reason the government "barely survived" Barone's motion to acquit. Id. at 429, 437.

Years later, Jordan contacted law enforcement and stated that he had committed perjury at Barone's trial. He explained that before Ferrara pled guilty, he told members of the FBI task force investigating the Patriarca case, including an Assistant United States Attorney, that Barone had in fact never received Ferrara's permission to kill Limoli. Id. at 406. The court found that the prosecution had a memorandum memorializing Jordan's recantation, but intentionally withheld it from the defense. Id. at 394-97. Instead, the prosecution had filed a trial brief stating that Jordan would "testify to Barone's statement that Limoli was killed on the orders of Vincent Ferrara." Id. at 397.

Ferrara never admitted to killing Limoli. Instead, he "disclaim[ed] any complicity in th[e] murder" and told the probation department promptly after pleading guilty that he was actually innocent and did not order Barone to kill Limoli. Id. at 400. However, he explained that he had pled guilty because he "was in the 'untenable position' of having to risk a jury verdict based on false testimony by Jordan that could result in a sentence of life in prison or plead guilty to a crime that Ferrara was claiming that he did not commit, and accept a twenty-two year sentence, in order to avert that risk." Id.

16

This court found that "the suppression of Jordan's recantation regarding his claim that Ferrara ordered the Limoli murder utterly undermin[ed] [its] confidence that Ferrara would have agreed to a twenty-two year sentence in the absence of the government's misconduct." Id. at 432. It found that "if proper disclosure had been made, there [was] a reasonable probability that: Ferrara's counsel would not have advised him to agree to a twenty-two year sentence; Ferrara would not have pled guilty to the murder related charges; and if he had attempted to do so, the court would have found that there was not a proper factual basis to accept his plea to those charges." Id. at 423. Accordingly, the court vacated Ferrara's sentence. Id. at 441. The First Circuit affirmed. See Ferrara, 456 F. 3d 278.

"Unlike the petitioner in Ferrara," Castro "admitted his factual guilt (including the nature of the contraband sold) in open court at the time that he changed his plea." Wilkins, 754 F. 3d at 30. Castro admitted that he "knowingly and intentionally possess[ed] with intent to distribute and...did distribute cocaine base." Feb. 14, 2012 Tr. at 12. "This admission is entitled to significant (albeit not dispositive) weight when, as now, he seeks to vacate that plea through a collateral attack." Wilkins, 754 F. 3d at 30. "Such an admission is especially compelling because [he] neither attempts to explain it away nor makes any assertion of factual innocence." Id. In addition, as explained earlier,

17

Dookhan's drug certifications were not critical to the government's case against Castro as Jordan's testimony was to the case against Ferrara. In fact, they were not material.

Therefore, Dookhan's misconduct does not undermine the court's confidence in the outcome of Castro's case. Unlike <u>Ferrara</u>, he has not demonstrated a "reasonable probability" that "but for [the withholding of the information], he would not have entered the [guilty] plea but would have insisted on going to trial." <u>Wilkins</u>, 754 F.3d at 28. Accordingly, the motion to vacate must be denied.

V. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. The Motion to Vacate and Withdraw Plea of Guilty (Docket No. 46) is DENIED.

2. The Motion to Unseal Ex Parte Motion for Reappointment of Counsel (Docket No. 37) is ALLOWED.

3. The Motions for Extensions of Time (Docket Nos. 47 and 49) are ALLOWED.

/s/ Mark L. Wolf<br>UNITED STATES DISTRICT JUDGE